Our second case is number 183702 Armfield versus Nicklaus and we'll begin with Mr. Ryder Lawnmaid. Good morning to you and to Ms. Bendick. Good morning. May it please the court. Two serious Sixth Amendment violations deprived Mr. Armfield of his fundamental right to a fair trial. First, the confrontation clause violation that neatly tied up the prosecution's case. And second, ineffective assistance of counsel that allowed the prosecution to brand Mr. Armfield and his co-defendants community super predators who would shoot up people they disagreed with in broad daylight. And the prosecution was able to use that also to bolster witness credibility. Each of these errors warrants habeas relief in a new trial. Together, they should surely shake this court's confidence in the result. I would like to start with saying a few things about the Bruton violation and I'm happy to answer any questions there. But I also want to make sure I have time to turn to the Strickland violation. The party spent less time briefing it, but it's a very significant constitutional error. And it also warrants relief here on the Bruton claim. As you know, the rule of Bruton is that a limiting instruction does not work to cure a confrontation clause error that occurs when a jury is exposed to a co-defendant's confession made out of court and there is no opportunity in court for cross-examination. That is exactly what happened here. The parties spend a lot of pages in their briefing discussing whether this case, Frazier v. Kupp, applies. And I'm not going to rehash for you unless you have questions the two reasons that the state appellate courts unreasonably applied confrontation clause precedent. But I want to focus for just a moment on the Frazier case because it's really the post hoc rationalization the state offers and the district court offered to defend against the confrontation clause violation here. So in Frazier v. Kupp, we have a very limited exception to the confrontation clause rule set out by Bruton and then again subsequently in cases like Richardson and Gray. And what Frazier says, if you can even find a rule statement there, is that in the limited circumstances where the jury is not told that there is some evidentiary memorialization of that testimony. It's significant to the court's result in Frazier, and this is at page 734 of the court's opinion, that the rules in that case. And so the jury was exposed only to a brief preview of what Rawls might say if Rawls were called to testify. Rawls was never called to testify. He pleaded the Fifth Amendment and there was no more said of it. By definition, it couldn't have been a vitally important part of the prosecution's case. This case is very different, whether you look at it as a matter of de novo review, which we submit is the correct way to see this for the reasons we've explained. We'd point you to Wilson v. Sellers, the Supreme Court's opinion in 2018. But in any event, even if you look at it under the habeas standard of review, we don't think a fair-minded jurist could think Frazier applies in this circumstance. Of course, the state appellate court didn't rely on Frazier, didn't even cite it, right? That's exactly right, Your Honor. And we're not saying that the state appellate court needs to be aware of all of the Supreme Court's decisions. But what's significant, as I mentioned in Wilson v. Sellers, is the court quite clearly says they're drawing on a long line of Supreme Court cases that had come before, that what the federal habeas court needs to do is look at the actual reasons the state court gave for its decision and defer to those reasons only if they are reasonable. That's the only way to understand what's happening in Wilson v. Sellers. Wilson v. Sellers, of course, confronts the circumstance where the last opinion from the state court is unreasoned and it has to look through. And the only reason you would look through to the lower state court opinion is to determine the reasons the court actually relied on for its result. So that's exactly right. You would look here and we've explained why the two reasons that the state court gave are in fact unreasonable. I don't think the state can test that in serious regard. I think mostly what they're pointing to is Frazier v. Kupp. And as I said, it's a very different case. It's not a joint trial case. It's a case where there's no reference to the actual confession and such. And what I want to point out here is that in Mr. Armfield's case, the jury received this statement about Nelson's confession at deliberations. There was no opportunity for defense to do anything about it. And it put the prosecution's entire case in Nelson's mouth. That's it. If you start reading it, Essay 162, you'll see the prosecutor in that statement explaining what had happened, what the evidence would show. And then he says at Essay 164, you'll hear Nelson's own words, how he and his partners murdered Al Copeland. It's also significant. I would point you to five pages later in the same transcript that went back to the jury at Essay 169, Nelson's lawyer basically says, yes, you will see a videotaped statement. As the state says, it's my client's confession. And so there could be no question in the jury's mind that there actually was a videotaped confession here. That's a point of extreme importance for distinguishing Frazier, where the jury was not told against 394 U.S. at 734, that there was a confession in that case. So it was testimony that might've been expected, never produced, the jury would make nothing of it. By definition, as I said, could not be a vitally important part of the prosecution's case. But in this case, we know the jury is sitting there. We know that it deliberates for almost 14 hours. We know that it sends multiple notes back, that it's having a hard time. And we further know that the jury ends up deciding a special verdict that the fact does not exist that Mr. Armfield discharged a weapon. What does that tell you? I mean, if we move over to the harmlessness analysis, and then I would pivot to the prejudice analysis in Strickland, obviously there are slightly different governing standards for those two things, but it would be easy to explain why the state court's decision wasn't reasonable in both regards. And in any event, when you look at the record as a whole, as you have to under both Brecht versus Abramson in Strickland, why you would find that the fair-minded jurists would have to conclude that there was prejudice here. I would point out that what Nelson's statement does is it ties up the prosecution's case, because you have witnesses who are not particularly credible, as even the state acknowledges an opening argument in Essay 48. It says you don't know exactly what they're going to say. And again, beginning at around Essay 569 or 570, acknowledging the problems with the witness's credibility and asking the jury to believe that the witnesses are credible. Well, you can imagine that an out-of-court confession has no cross from Nelson. By the way, it's also the main bad guy, if you will, in the third shooting, with the Strickland error that we'll talk about in a minute, is going to make it much easier for the jury to say, well, of course, Mr. Armfield was involved in this. Okay, so there were essentially, what I'll talk about the evidence in three phases, and Mr. Arnott has a question. I was going to say there are three pieces of this, three different episodes. And you have to look, of course, both under the Brecht standard and under the Strickland standard, at the strength of the prosecution's case to evaluate prejudice and then figure out what the case would have looked like without this evidence coming in. And so I'll just say for a minute, I think, about the Strickland error that occurred. Then, by the way, the state doesn't contest that there was deficient performance here. And the state appellate court doesn't find that there was not deficient performance. So your review would be de novo. And it's quite clear, I think, that the evidence that came in is not relevant. If it's relevant, it's far more prejudicial than it is relevant. And it's evidence of other crimes, which is a matter of Illinois law, has to be connected to the defendant. What we have here is Tykema Walker. She's testifying. She's driving with her two young kids. I think they're about five and six months old. They're going to the jail to visit her partner. And they get shot up by a car being driven by a certain Pooch Ellen, it's not certain who that is, and Nelson and two other men in the car. Now, after you hear that, which is very prejudicial, allows the prosecution to classify these defendants. Why these defendants? I'll say more about that in a minute. But say these are community super predators. They should scare the jury. They should have also scared the witnesses in this case. And again, it allows the prosecution to bolster the credibility. What then comes in is testimony from Detective Frank Romiglia, who's talking about three guns that were recovered. Only one of these three guns was connected in any way to the crime. It was a nine millimeter semi-automatic handgun that was connected to the crime through forensic scientist Melissa Nally, who said, yes, this was used by Nelson in the crime. But what you don't have is any way that Cone, defense counsel, is either excluding this testimony in the gun evidence, or he's stepping up and saying, my client couldn't have been there. He was incarcerated at the time. Mr. Ryder-Lamig, can I, I want to pause you on the prejudice part of the Sixth Amendment claim. You, in your brief, and you do quite a fine job, in my view, advocating a particular perspective on the evidence. When I looked at it, though, what I'm concerned with is whether the evidence doesn't show quite a strong case against your client. And in particular, there's multiple witnesses. You're, one of the tough parts about the hand you've been dealt here, in my view, is that you've got multiple witnesses that put Mr. Armfield with Mr. Nelson and Mr. Randall, you know, at times that are very unfortunate for Mr. Armfield. And the testimony in particular of Ms. Floyd seems very, very damaging to your client. I know we're not doing sufficiency of evidence review, and we're not operating under Jackson versus Virginia. I'm well aware of all of that. But that testimony from Ms. Floyd, if credited by a jury, is that not devastating to Mr. Armfield in his pursuit of relief here? So, Your Honor, I'm glad you said if credited, because we know that at least in substantial part, the jury did not credit that testimony when it returned the special verdict saying that Mr. Armfield, the fact did not exist that Mr. Armfield was charged with firearm. I think we could agree that a witness who says one thing at one time and then recants later is unreliable. But you'd have to ask as well, what other corroborating evidence is there? And I want to just quickly talk about the 6 p.m. shooting and the 9 p.m. shooting. The 6 p.m. shooting, there are two witnesses. You have Willie Williams, and you have Yakira Robinson. Yakira Robinson says she doesn't actually see Armfield's shooting. She sees Armfield and also Nelson and Randall, and then she goes back into her car, and then hears shots. So she doesn't actually put a gun on Armfield's hand and can't necessarily say that he did it. Why does this matter? Well, we know from Willie Williams, who, by the way, is on heroin at the time of the trial, cannot identify Mr. Williams in the courtroom. And Willie Williams, but he does say there were other people on the street at that time. So I think it's quite inconclusive as to the 6 p.m. shooting, whether Mr. Armfield was this other person that was there. And as for it, if you look at the state court's opinions, by the way, in the Bruton opinion, the state court essentially acknowledges that Williams is unable to place Mr. Armfield at the scene there. And then the state court takes a different tune in the Strickland opinion and says, no, he did. We go to the 9 p.m. shooting. Jenkins, who's Al Copeland's partner, is unable to say who did it. Okay, so we know there are two shooters. We have forensic evidence saying there's two shooters, but she's not able to put it on Mr. Armfield. That leaves Vincent and Floyd. And just quickly on Vincent, what I would say about him is that we have testimony from Detective O'Donnell. This is essay 549 through 551. He says he spoke with Vincent the night of the crime, didn't consider Vincent to be an eyewitness. If anything, Vincent was just reporting things that he heard in the street. It's only after Vincent is picked up eight or nine months later on a felony gun charge that all of a sudden he has something to say about Mr. Armfield's involvement there. And if you parse through the testimony from Vincent, again, he's putting Armfield at the scene, but he's actually saying he could see where Armfield was shooting from. So there are questions there. If you go over to Floyd, what I would say about Floyd is, again, she is someone who the jury is going to have serious concerns about her credibility, given her two different positions, whatever they are. But I'd add as well that we know that ASA Ryan Hofeld Mirandizes her. Why does he Mirandize her? Because she's driving the car. In her own account, if you credit one of them or not the other, she could somehow be involved and have criminal liability for what happened here. That certainly could be a potential motive to lie. We also know that she's Randall's girlfriend. It could be another motive to try to inculpate someone else on this. We don't know. But as Your Honor said, the jury was unable, didn't have this opportunity to evaluate credibility without a serious error. And why do I point to the serious error? When the testimony and the guns about this third episode come in about the courthouse shooting, the prosecution is able to make a lot of use of this. It's able to say, and actually I think in quite a confusing way, I'd urge Your Honor to look at page SA573 to 574, where the prosecution repeats four times the name Calvin Armfield in a way that we know actually confused the state of public court the first time around in Bruton when the state of public court says the guns were found in defendant Armfield's vehicle. That's just wrong, as we explained in the brief. It was found in Calvin Armfield's vehicle. There's no evidence that there was a relationship there. If anything, it would have been an opportunity for Cohn to say, there were other people in this group that could have been responsible for this, but he does nothing. He doesn't present to the jury the fact that my client was incarcerated at that time. So instead, the jury is left with this notion that there are a group of people, including the defendants, my client. Remember, there were two people that were unidentified, Mitch Akima Walker, in the car. So you either have confusion between the two Armfields because they're interchangeable, perhaps in the jury or prosecutions, or because you think there's an association there. And what you're left with is that not only should the jurors be afraid of the defendants collectively, in terms of retaliation of some kind, but also that they were threatening the witnesses. And if you look through the testimony, starting at 570, and also the rebuttal testimony and closing argument, you will see that the prosecution suggests that the reason Vincent didn't come forward right away, the reason Robinson didn't come forward right away in press charges, and the reason that Yakira Robinson recanted, was because they were being threatened. And Lisa, I'm going to need to cut you off there. You're well into your rebuttal time, and I know you want to save a little. Thank you, Your Honor. And I'll give you a couple of minutes, but we need to hear from Ms. Bendick. And why don't we do that now? Good morning, Ms. Bendick. Good morning, and may it please the Court. Counsel, my name is Leah Bendick from the Illinois Attorney General's Office on behalf of Respondent. This Court should affirm the judgment of the District Court, which rejected Petitioner's habeas petition, including the two issues certified on appeal, the Confrontation Clause claim and the Trial Counsel Ineffectiveness claim. I'm going to begin with the Confrontation Clause claim, which this Court can reject on any of three independent bases. First, that there is no clearly established United States Supreme Court precedent on similar enough facts so that the claim fails at the threshold of the 2254D standard. Second, that if this Court reaches the merits in light of that precedent, namely the Bruton line, that the State Court's rejection of the claim on the merits was reasonable. And finally, that any error was harmless. So I would like to talk about the first two grounds together because they're quite interchangeable. And the two key cases, of course, are Bruton, the lead case, and the case of Frazier. Now, I want to stress Frazier. You know, let me just start you off because your argument is that Frazier dictates that if the prosecutor merely paraphrases the co-defendant's confession that there's no Bruton error, there were many differences between what happened in the Frazier case and what happened here. How do we know that the paraphrasing part is what makes the Frazier fact scenario exempt from Bruton? Well, Your Honor, I would actually slightly characterize our argument differently than you described. The paraphrasing is not the only key fact. Instead, actually, I would say the key fact here is the way in which the jury was potentially exposed to this objectionable content. It was during deliberation in these mistakenly provided transcripts. But let's remember here that while this was a simultaneous proceeding, Nelson was severed. His case was severed and held before a different jury. And so what had happened was there was an opening statement made only before Nelson's And so when petitioners jury during deliberations, they asked for two specific things. They asked for the police statements of two witnesses. They asked for the jury testimony, the grand jury testimony of Floyd and Prosper. And what the trial judge did is said, here, let me give you the transcripts, the entire transcripts from the first two days of trial. So when handed that big stack of paper, it is far from clear that the jury happened to read the single page in which this brief reference more likely that what they did is flip to page two of the trial when Floyd and Prosper testified, and when much of their grand jury testimony came out during the proceedings. We don't know that they looked at that page. That is a key distinction. We don't know that they did not look at that page. That is also true. And you seem to be arguing that a Bruton issue is less of a problem when the jury receives the information during deliberations. My view would be that it would make the information fresh in the jury's mind during deliberation and thus possibly more damaging. Well, I have two responses to that, Your Honor. And the first is look at the cases we have from the U.S. Supreme Court, which is all that matters for habeas review. Putting Frazier aside, all five cases in the Bruton line involve exposure to the jury deciding the case of the complete contents of the confession during the evidence phase of trial. So it was clear they were told this is evidence you should consider. Now, the difference here, or looking at Frazier, we should keep Frazier in mind because when Frazier was looking at what happened in those distinct facts, it only was during opening statement and the jury was additionally instructed that opening statements are not evidence. Now, what we have here, you're right, is a different situation. But remember what we have here, if we're assuming the jury did look at these particular pages, those pages were preceded by that same instruction that opening statements are not evidence. And so this did not have the dynamic present in Bruton where the same jury was told, here is a piece of evidence. You can consider it when evaluating the guilt of one defendant, but not the other. That is not true. In Frazier, the prosecutor made a fleeting reference to an accomplice's anticipated testimony sandwiched between far more crucial information. It was done in the actual opening statement of that trial, not the transcript of another trial. The jury wasn't asked to consider the incriminating statement only against one co-defendant and not the other. And the statement wasn't vitally important to the prosecution's case. You're right, Your Honor, and all of those dynamics are present here. Because again, we have that same instruction given about opening statements are not evidence. And remember, let's think about that threshold question for habeas review. There has never been a Supreme Court case looking at the mistaken provision of transcripts. So it's possible they would view it as potentially more significant, but it's also possible they would view it as less significant because it's even more clear that it is not evidence to be considered. Because remember, not a single word about Nelson's confession was mentioned during any proceedings held in front of Petitioner's jury. Nelson's videotaped confession was never admitted into evidence or played before Petitioner's jury. Just the fact that that word videotape was uttered does not mean that the jury ever saw that videotape. It was not the evidence given to separate evidence. My difficulty is with your argument that the jurors didn't hear the substance of Nelson's confession. This is what the, let's see, the provided transcript stated. Quote, you are going to see a statement given to a Cook County prosecutor that was videotaped of Nelson confessing to shooting Al Copeland. You will see him tell you how he and his partners murdered Al Copeland in his own words. They acted as a team. That is the substance of Nelson's confession. It might not be him saying it, but it certainly gets at the content and substance, doesn't it? It is still a brief reference, Your Honor. And actually, in addition to that, even more important than that point is the timing and only potential exposure of this information to the jury. We don't know that they looked at this single page, number one, and number two, they were never played the confession itself. It was never admitted into evidence. Petitioner's jury was instructed that the only thing that is evidence that you should consider is the testimony of witnesses, it is stipulations, and it is exhibits. That does not mean they were not supposed to consider this content for any purpose. You know, I know we count on jurors to heed our instructions when we tell them that opening statements are not evidence. Of course, whether they do or not is subject to some debate, but that's beside the point. But do we think that they can carry that instruction through to the idea that opening statements in another trial, a different trial, a trial for which they have been provided a transcript, is also not evidence? We can, Your Honor, because they also received the instruction that said, each defendant should be judged based on the evidence pertaining to that defendant. You can see that at separate appendix, page 629. And we know that the very first page of this section of the transcript, the Nelson opening statement, began by saying, this is the opening statement given to Nelson's jury. But even putting that aside, remember the 2254D standard, which looks at what are the Supreme Court cases on the books. And as Van Patten described, where there's no clear answer to the question presented, let alone one in the defendant's at the threshold. We don't have any case with this fact of a mistakenly provided transcript. To my knowledge, there is no case in any court that opposing counsel or we have found, much less a U.S. Supreme Court case, considering a brutal claim about a mistakenly provided transcript from proceedings that did not even occur before the jury in question. I mean, that's very distinct factually. And so that's reason for the claim to fail. I do want to note my time is a little short. It's reason to fail because there are no other such cases? Right. Because there's no way to know whether it be viewed as a reason to distinguish it or a reason to extend the Bruton line. That's how law is made, isn't it? I'm sorry, I missed. Isn't that how law evolves? That is in the habeas. In habeas, we have to be careful to look at the clearly established United States Supreme Court precedent, perhaps on direct review, perhaps on even state collateral review. But when you're saying there is no precedent, what are we supposed to be looking at if there's no precedent? Then the claim fails. That's the Van Patten standard. We don't look at the facts? The facts are too different for us to know the clear answer that should result under these facts. And so since I only can you yes. Can you comment on the harmless error aspect of the Illinois Court of Appeals opinion and in light of some of the points that Mr. Rider-Long made this morning? Well, I would agree with your honor when you pre-stressed Floyd's grand jury testimony as particularly important. And although his first response to that point was to raise the personal discharge verdicts, that is actually beside the point for where Floyd was helpful. Because after all, Floyd didn't purport to see the shooting itself. She provided the context before and after the shooting and put the group there and their intent to target the victim. And I would also agree that the second thing that's so powerful about the strength of evidence of guilt here is the fact that it is a consistently provided narrative by multiple witnesses that corroborate each other. And so yes. One witness that was on my mind, I don't know if she should be or shouldn't be, you can tell me and Mr. Rider-Long can, is Mr. Randall's sister. Didn't she see these three fellows together an hour or two before this shooting and hand a stocking cap or something with guns in it? Yes, during the eight o'clock hour. So that was shortly before the fatal shooting. Yes. Yes, and that is noteworthy too, because it puts them all in the car as Floyd described. And she said, oh, I felt heavy objects that I assumed were guns. So that explains how Randall helped facilitate the group to get the weapons they needed to again target Mr. Copeland on the nine o'clock hour, at the nine o'clock shooting. Now, to the extent that there were a few moments where the state court erroneously described aspects of the record, that is not determinative here. The state court did not purport to have their judgments depend on these inaccuracies. And instead, remember, this trial counsel claim came up during post-conviction where those errors were not described. But the incorrect version directly links him to the murder weapon. Whereas in the correct version, there is no direct connection between the murder weapon and arm field. That mistake was only mentioned during the direct appeal decision. That's the confrontation clause opinion. When the trial counsel claim came up, that was the post-conviction opinion where that mistake was not made. And in that opinion, the court described the strength of the evidence and did not list that as one of the things it was considering. And in any case, under the Brecht standard, at least, what the state court did on review is not relevant. We just look at the error and we look at the likelihood it impacted the verdict. That cuts out the state court appellate review process from the analysis. And let's remember that even in the Strickland context, that the error involved described this other shooting that petitioner was not present at. And so even my opponent acknowledges some of that evidence was probative. But even looking at the entire sum total of the pages where that dealt with that trial, it's a couple dozen pages. You can see the citations at page nine of the appellee's brief. This is a 600-some page trial. It was not extensively focused on during the trial. And so again, at page 39 of the appellee's brief, we've provided multiple cases from this court, citing strong evidence of guilt as reason alone to find that the state court reasonably rejected a claim on the prejudice prong of Strickland. So we would point your honors to those cases because here, as Judge Scudder properly focused, it is both Floyd's testimony and the corroboration that makes this a strong case. I see my time has expired, so I would conclude by saying we would ask the district court judgment be affirmed. Thank you. Thank you. Thanks to you, Ms. Bendick. Mr. Ryder-Longmaid, we'll give you two minutes to make some closing comments. Thank you, Judge Scudder. Just to go through some things quickly, Judge Roper asked about, I was talking with opposing counsel about how we know the jury looked at this. I'd point the court to RSA 35, where the court says the jury was allowed to read something that it was not allowed to hear at trial. So the state appellate court accepted it on that formulation. And of course, that makes abundant sense. The jury had asked for materials to come back. It would have looked at them. And we also know under Bruton that we can't be sure whether the jury considered something as a doctrinal matter, and that would apply here. We don't need a case that's direct. Second, we don't need a case that's directly on point. That would be under the contrary to standard. We're talking about unreasonable application of the principles that the Supreme Court has articulated in its Confrontation Clause cases. We've explained that in the briefs. As for the particular errors that the state court made in the harmlessness determination, the Strickland opinion does incorporate, by reference, the analysis of substantial evidence. In the Bruton opinion, that's at SA 49. So I think it's quite reasonable to look at that and say, of course, they were looking at this when they were deciding at SA 48 that there was overwhelming evidence in this case. I don't think even the prosecution thought there was overwhelming evidence in this case. And Judge Scudder, of course, your questions went to whether or not we've gotten over the reasonable doubt. But here, there, of course, was reasonable probability of reasonable doubt. You do have to look, and we've cited cases in the brief, at holding everything else in the trial constant. And we do know about the special verdict, which matters. It says that the jury, even with both of these errors, somehow thought that Floyd and the other witnesses were not particularly credible. So the question here is not, as your Honor said, whether there's sufficient evidence to time the start of the crime, but whether the jury might have arrived at reasonable doubt. And it's quite clear in the circumstance that that was the case. So I would ask that the court reverse the judgment of the district court and remand with instructions to have a new trial or release Mr. Armfield.  MR. ARMFIELD. Thanks to you. Ms. Bendick, thanks to you for your argument. Mr. Ryder-Lawnmaid, thank you for your argument, your briefing, and for taking the appeal on appointment. I know this is not the first time you've done so. You have the thanks of the court, as does your firm. And Mr. Armfield should know you've done a very fine job for him. So with that, we'll take the case under advisement and move to our third case of the morning. MR. RYDER-LAWNMAID. Thank you, Your Honor. MS. BENDICK.  MR. RYDER-LAWNMAID. Oh, I'm sorry. I'm sorry. We are going to take the 10-minute break we announced at the outset. So we'll be back in a few minutes. MS. BENDICK. Thank you.